IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BELDEN TECHNOLOGIES INC. and BELDEN CDT (CANADA) INC., | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. No. 08-63-SLR |
| | ) | |
| SUPERIOR ESSEX COMMUNICATIONS LP and SUPERIOR ESSEX INC., | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM ORDER**

At Wilmington this 24th day of August, 2010, having heard argument on, and

having reviewed the papers submitted in connection with, the parties' proposed claim

construction;

IT IS ORDERED that the disputed claim language of U.S. Patent Nos. 5,424,491

("the '491 patent"), 6,074,503 ("the '503 patent"), 7,135,641 ("the '641 patent"),

7,339,116 ("the '116 patent"), 6,570,095 ("the '095 patent"), 6,998,537 ("the '537

patent") and 7,179,999 ("the '999 patent") shall be construed consistent with the tenets

of claim construction set forth by the United States Court of Appeals for the Federal

Circuit in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), as follows:

1. **"[C]onfigurable:"**[1] "Flexible enough to be formed or arranged." This

construction is consistent with the claims as well as the specification. ('095 patent at

---

[1] '095, '537 and '999 patents.

col. 7:19-20; col. 3:6-9)[2]  The parties agree in principal with this construction, diverging only with defendants' proposed additional limitation of "providing structural stability during manufacture."  While the specification describes one embodiment directed to a configurable separator that provides structural stability, the court declines to import the limitations of a single preferred embodiment into this limitation.  *See Comark Commc'ns. v. Harris Corp.*, 156 F.3d 1182 (Fed. Cir. 1998).

2. **"[D]ielectric pair separator**"[3]  "Pair separator that serves as a dielectric medium."  This construction is consistent with the claim language of the '095 patent. ('095 patent at claims 1, 10, 14-17, 27, 31; '537 patent at claim 19)  For example, claim 24 discloses "a dielectric pair separator consisting of a dielectric layer and a conductive layer" while other claims disclose a dielectric pair separator "consisting of" only a dielectric layer.  Conversely claims 27 and 31 of the '095 patent simply recite a "dielectric pair separator."  This construction is also consistent with the claim language of the '537 patent.  Claim 19 recites a "dielectric separator that consists of nonconductive, dielectric materials" including a "foamed polymer."  The language "consists of" serves to narrow this term to require purely nonconductive materials. Neither the '095 patent nor the '537 patent support plaintiffs' narrow understanding of this limitation to mean a "non-conductive separator."  Accordingly, the claims of both patents demonstrate that the patentee understood this limitation broadly and narrowed it when necessary with further limiting language.  *See Phillips*, 415 F.3d at 1314.

---

[2]Insofar as the specifications for all three of these patents are substantially similar, the court cites solely to the '095 patent specification.

[3]'095 and '537 patents.

3.  **[G]rooves**[4] and **[C]hannels**:[5]  "Regions within the cable that are

substantially physically separated from other regions within the cable by a pair

separator; i.e., they are formed by, but need not be part of, the separator."  This

construction is consistent with the claims as well as the specification.  (col. 5:4-5; col.

7:26-29)  The parties agree that the '095 and '999 patents use these two limitations

interchangeably.  Despite an ordinary meaning describing these limitations as "narrow"

regions, the court declines to incorporate this limiting term into its construction in view of

the relatively broad grooves displayed by figure 5.  Moreover, although formed by the

pair separator, the "grooves" and "channels" are discrete from, and not physical

attributes of, the pair separator.  (*See* figure 5 (depicting a preferred embodiment which

has "grooves" formed by arranging the pair separator, yet grooves do not appear to be

components of the pair separator))

4.  **[S]ubstantially flat**:[6]  "Thin and substantially uniform in thickness."  This

construction is consistent with the claims as well as the specification.  The parties'

disagreement concerns plaintiffs' proposed additional limiting language "having an

overall profile that is substantially straight."  Considering plaintiffs' proposed

construction in the context of claim 27 of the '095 patent, which describes taking a

substantially flat configurable dielectric separator and arranging it to form at least two

grooves, would lead to the illogical result that the separator have "an overall profile that

---

[4]'095 patent.

[5]'999 patent.

[6]'095 and '537 patents.

3

is substantially straight" **after** arranging it.  The specification explicitly counsels against the result of plaintiffs' proposal, describing the pair separator in figure 6 as a "**flat** configurable tape used as a core filler, that is **shaped** to have the illustrated profile . . . ."  (col. 6:12-15)

5.  "**[T]ape:**"[7]  "Long, flexible strip of material."  The parties generally agree with this construction, disputing only plaintiffs' proposal to additionally include the limiting phrase "substantially flat."  Claim 3 of the '999 patent recites, "[t]he unshielded twisted pair communications cable as claimed in claim 1, wherein prior to cabling, the configurable tape separator comprises a **substantially flat** tape."  (emphasis added) The presence of the additional limitation "substantially flat" in dependent claim 3 gives rise to a presumption that the limitation is not likewise present in independent claim 1. *See Phillips*, 415 F.3d at 1314-15.

6.  "**[T]elecommunications cable**"[8]  "Cable capable of transmitting high frequency data."  Construing the preamble in this manner comports with the specification, which repeatedly identifies the invention of the '491 patent as a "high frequency cable."  (Abstract; col. 1:7-23; col. 2:4-6)  The specification further recites that the invention of the '491 patent seeks to rectify nominal characteristic impedance problems for "telecommunications cable[s] . . . designed to operate at high frequencies, perhaps up to 100 megabytes."  (col. 3:67-4:5; col. 4:39-44)

---

[7] '999 patent.

[8] '491 patent.

4

7. "[G]roup:"[9] "Two or more." This construction is consistent with the specification. (col. 2:12-14, 24-27) The specification refers to a "group" of conductor pairs as a plurality of conductor pairs, to wit, two or more conductor pairs.[10] (col. 2:60-66 ("The conductors of the **second plurality** of conductor pairs each has substantially the same conductor thickness which is different from that of the **first plurality** of pairs to provide a nominal characteristic impedance for each conductor pair of the **second plurality** which is within the desirable limits and also an acceptable signal attenuation.")) (emphasis added)

8. "[D]ata cable:"[11] No construction is needed as the preamble does not limit the claims. Plaintiffs argue that the preamble should limit the claims of the '116 patent and be construed to mean "high speed data communications cable." The '116 patent is entitled "High Performance Data Cable, and the specification generally notes that "[m]any data communication systems utilize high performance data cables having at least four twisted pairs." However, the specification refers to both low speed and high speed applications (col. 1:16-29, 30-38, 35-52), and describes the invention as having a plurality of twisted pair conductors (col. 2:49-50), a ubiquitous characteristic among general telecommunications cable and high frequency telecommunications cable. Accordingly, the preamble does not limit the claims of the '116 patent.

---

[9]*Id.*

[10]The Federal Circuit has interpreted "plurality" to mean "more than one." *See, e.g., Bilstad v. Wakalopulos*, 386 F.3d 1116, 1122-23 (Fed. Cir. 2004).

[11]'116 patent.

5

9. **[O]pen space**:"[12] "Region between projections of the core, which may be occupied by a twisted pair of conductors, air, or a filler material." This construction is consistent with the claims as well as the specification. (col. 4:62-66; col. 5:47-49)

10. **[C]able covering**:"[13] "A means to insulate and protect the cable that is exterior to the interior support and insulated conductors disposed in the open spaces of the interior support." This construction is consistent with the specification, in which the patentee evinces its understanding that a cable covering serves to "insulate and protect" the cable. (col. 5:39-45) Figure 1A is described as "provid[ing] an example of an acceptable cable covering" including an "outer jacket, shield, drain spiral and binder . . . ." (col. 5:42-45) This exemplary language does not, however, work to further narrow this limitation to the recited components.

11. **[C]ontacting each projection**:"[14] Insofar as neither the specification nor the prosecution history address this limitation, the court does not, at this time, engage in construction. The parties may present evidence at trial as to whether this limitation requires construction and, if so, the appropriate construction.

12. **[C]ore**:"[15] "A longitudinally-extending element that separates **the** transmission media." This construction is consistent with the specification. (see col. 1:8-9; col. 2:67-3:2; col. 3:11,13; col. 4:62-64) The parties' respective proposed

---

[12]*Id.*

[13]*Id.*

[14]*Id.*

[15]'503 patent.

6

constructions differ only by inclusion of "the."  Defendants argue that this article is

necessary to indicate that the core separates each twisted pair from one another, as

opposed to separating some, but not all, twisted pairs.  The court agrees.  None of the

described embodiments contain transmission media which are not individually

separated by the core.

       13.  "**[S]urface features**:"[16]  "Recesses on the surface of the core."  This

construction is consistent with the specification, which describes "a core having a

surface defining recesses . . . ."  (col. 2:60-62)

       14.  "**[A] first die which aligns the plurality of transmission media with
surface features of the core**:"[17]  The meaning of this limitation is readily apparent to

those of ordinary skill in the art and, according, no construction is necessary.

       15.  "**[A]n outer jacket that maintains the plurality of twisted pairs of
conductors in position with respect to the non-conductive central core**:"[18]

Defendants have asked the court to construe this limitation of the '944 patent, despite

the existence of a covenant not to sue between the parties with respect to this patent.

The court finds speculative defendants' claim that a case or controversy exists solely by

virtue of the covenant not extending to future products manufactured by defendants.

Indeed, the "residual possibility of a future infringement suit based on . . . future acts is

simply too speculative a basis for jurisdiction."  *Super Sack Mfg. Corp. v. Chase*

---

    [16]*Id.*

    [17]*Id.*

    [18]U.S. Patent No. 6,596,944 ("the '944 patent").

*Packaging Corp.*, 57 F.3d 1054, 1060 (Fed. Cir. 1995). Accordingly, the court declines to exercise jurisdiction over this patent.

United States District Judge